RICHARD M. O'DONNELL, ET AL., RESPONDENTS, v. PORTER MATHEWS, APPELLANT.*

Kansas City Court of Appeals. May 24, 1926.

*L. T. Dryden* and *W. C. Hock* for appellant.

*Gossett, Ellis, Dietrich & Tyler* for respondents.

BLAND, J.—This proceeding is based upon a petition praying for the partition of certain land in Jackson county, Missouri, sale of the property and payment from the proceeds thereof of the costs and expense of the sale, including attorney's fees, and asking for the reasonable value of permanent improvements made by plaintiffs while they were claiming in good faith to own the entire estate in the land, and for such other and further relief as to the court might seem just and proper. The amended answer admits ownership of the land as alleged in the petition; admits that the land could not be sold without great prejudice to the owners; admits that plaintiffs had been for a long time in actual possession of the land. It then denies generally "every allegation in plaintiff's petition contained except the allegations herein specifically admitted" and alleges that since August 22, 1915, defendant was entitled to the possession of and to receive his proportionate part of the rentals and profits from the land; that plaintiffs had denied him such possession and participation in said rentals and profits; that plaintiffs had retained the exclusive possession and receipt of all said rentals and profits from the land; that the reasonable value of the rentals and profits since said date was $1500 per annum; that plaintiffs had committed waste upon the prop-

erty in failing to keep the roof upon the dwelling house located upon the property in repair, as the result of which rain water had damaged the residence to the extent of $500; that plaintiffs had used the residence to store grain and other farm products and had damaged the same in this manner in the amount of $300 and that plaintiffs had removed a brick building upon the premises to defendant's damage in the sum of $1000. The answer prays judgment against plaintiffs for defendant's proportionate part of said rentals since August 22, 1915, and for the sum of $1800 for waste committed by plaintiffs, "and that said sums be adjudged and decreed a lien upon the interests of plaintiffs in said property." A stipulation was entered into reciting that whereas plaintiffs—

". . . are making certain claims for taxes paid and improvements made and defendant is making certain claims for rents and profits and waste, and

"Whereas, it is not convenient to try said issues at this time, and the parties deem it to their mutual advantage to have an interlocutory decree of partition entered and sale made and entered and distribution of proceeds of sale made after paying costs and expenses of the action to date of distribution and costs and expenses of the sale."

The stipulation further provided that the trial of the issues of taxes, improvements, rents, profits and waste should be postponed and had as speedily as may be, either before or after the confirmation of sale and distribution of the proceeds of the sale of the land; that such claim should be tried—

". . . on the basis that, and as if, the proceeds of such sale were still in the hands of the court and either party, plaintiffs or defendant, shall be entitled to offset or to have and be paid by and recover of the other (opponent) party or parties such sum and sums as such respective party or parties may be held to be or have been entitled to have, paid out of such proceeds or otherwise on account of or for such respective claims and any of the same; and the opponent party or parties shall be bound to respond, refund and pay accordingly, and shall be so adjudged to do."

The decree in partition was rendered on March 2, 1922, and the report of the commissioner who made the sale was confirmed on May 22, 1922. On October 3, 1923, the issues of rents, profits and waste, improvements and taxes were tried before the court and a jury, resulting in a verdict in favor of plaintiffs in the sum of $2416.65 on the issue of improvements and $209.61 on the issue of taxes paid, and in favor of defendant on the issue as to rents and profits in the sum of $2382. Plaintiffs remitted the sum of $34.65 from the amount awarded for improvements and $8.61 from the amount awarded for taxes and judgment was entered off-setting plaintiffs' award for im-

provements against defendant's award for rents and profits and judgment was rendered in the sum of $201 in favor of plaintiffs on account of taxes paid by them on defendant's interest in the land. Defendant has appealed from this judgment.

The facts show that by deeds made in 1856 and 1857 the land in question was conveyed to Fannie A. D. Matthews for her life with remainder to her children. In 1866 the land was mortgaged by her and her husband to one Joseph Kinney, the mortgage purporting to cover the title in fee simple. At the time of the execution of this mortgage, some of the children of Mr. and Mrs. Mathews had died and the parents had by this means inherited an interest in the remainder of the fee subject to the life estate. Kinney's mortgage was foreclosed in 1871 and the land at the foreclosure was bought by his son, Joseph B. Kinney, who subsequently brought suit against Mr. and Mrs. Mathews for possession, claiming the entire estate in fee. The Supreme Court in Kinney v. Mathews, 69 Mo. 520, decided in 1879, held that Mrs Mathews acquired a life estate only in the land with remainder to her children but that such interest as she had in the land had been acquired by Joseph B. Kinney at the foreclosure sale. In 1882, Joseph B. Kinney conveyed said land to Mary O'Donnell, sister of plaintiffs. In 1892 the latter conveyed the land to her four brothers; two of whom are the present plaintiffs, the other two subsequently conveyed their interest in the land to plaintiffs. Mrs. Mathews died on August 22, 1915, leaving the defendant as her only surviving child and the owner of all the title except that owned by plaintiffs which was 1086/6300 in the greater part of the land and 4236/6300 in a 4-2/3 acres tract.

In 1880 Joseph B. Kinney caused the land to be sold for taxes and a tax deed to a portion of the land under the tax sale was made to his mother, Matilda Kinney, who joined in the conveyance to Mary E. O'Donnell. Shortly after the death of his mother, defendant brought suit against plaintiff to quiet title to the land and for the cancellation of said tax deed. The court rendered a decree cancelling the tax deed and decreed the title to be in the respective parties as above indicated. The case was appealed to the Supreme Court which on July 19, 1921, affirmed the decree. [See Mathews v. O'Donnell, 289 Mo. 235.] The present suit was filed on August 10, 1921.

The improvements sued for by plaintiffs herein are for clearing done in 1892 and subsequent years, the building of a cellar in 1901, the building of a barn and the digging of a well at the barn in 1903, the construction of a summer house in 1903, a granary in 1908, the setting out of an orchard in 1908, the fencing of parts of the land in 1912, the placing of a corrugated tin roof on the dwelling and digging a well thereat in 1912, and the erection of an iron tank for watering stock in 1913.

It is insisted that plaintiffs are not entitled to recover for defendant's proportionate part of the improvements because it is claimed a life tenant cannot recover from the remainderman for improvements. This is the general rule. [Gray v. Clement, 246 S. W. 940; Missouri Central Building & Loan Ass'n v. Eveler, 237 Mo. 679.] But the rule is now well settled in this State that a life tenant is entitled to recover for the enhancement of the value of land caused by valuable improvements, other than ordinary repairs, placed upon the land by him if made in good faith believing himself to be the owner of the fee. [Stump v. Hornbeck, 15 Mo. App. 367; Gallenkamp v. Westmeyer, 116 Mo. App. 680; Sires v. Clark, 132 Mo. App. 537.]

However, it is insisted by the defendant that the evidence shows that plaintiffs had notice of the condition of the title at the time they made the improvements. In this connection it is insisted that the court erred in refusing to admit a portion of the opinion of the Supreme Court in the case of Mathews v. O'Donnell, supra, l. c. 268, 269, 270, wherein it is now urged this contention was decided adversely to plaintiffs' claim by the Supreme Court. In that case the court held that it was the duty of the life tenant to pay the taxes and that the land at the tax sale was fraudulently purchased by the life tenant, Joseph B. Kinney, for the purpose of defrauding the remainderman, and that Mary O'Donnell and her grantees, including plaintiffs, knew of the fraud. It is insisted that this portion of the opinion should have been admitted on the ground that it was *res adjudicata* of the matter now sought to be adjudicated by plaintiffs. It is to be noted that the Supreme Court did not have under consideration the question of recovery for improvements, the matter now being litigated, but be that as it may, this matter was not pleaded in this case as *res adjudicata* or, in fact, mentioned in the answer, therefore, there is no merit in the contention. [Kilpatrick v. Robert, 278 Mo. 257; Nelson v. Jones, 245 Mo. 579; Beattie Mfg. Co. v. Gerardi, 166 Mo. 142; Bray v. Land Construction Co., 203 Mo. App. 642.]

On examination of the testimony at the trial, we find that it is conflicting upon the question of whether plaintiffs and their brothers knew of the condition of the title at the time the improvements were made or that they were inexcusably negligent in not knowing. Of course, if this is a law case, the facts being in conflict, the verdict of the jury is controlling upon us. But defendant insists that this is a proceeding in equity and that we must weigh the evidence and come to our own conclusion upon the subject. The case was tried as a suit at law. The record shows this beyond controversy. A jury was called as though it were a law case without any suggestion to the contrary, instructions were asked by both sides, a verdict was rendered by the jury, the court rendered judgment upon the verdict after the *remittiturs* were made and defendant filed motions for a new trial

and in arrest of judgment. These motions being overruled, he appealed. If there is such a thing in a case as estoppel to claim that a suit is one in equity, by reason of the fact that the case was tried by all the parties and the court on the theory that it was a suit at law, this would seem to be such a case. However, even in an equity case, although we are permitted to disagree with the conclusion of the chancellor, where the evidence is conflicting the rule is to defer to the finding of the chancellor who had the witnesses before him and was much better able to judge of the weight of the testimony than are we. This rule seems to have special application where the case has been tried before a jury. The verdict in the case at bar was unanimous. The facts having been passed upon by thirteen men including the trial judge, we are not disposed to differ with the conclusion reached. [See Walker v. Owens, 25 Mo. App. 587, 595.]

The facts concerning the question whether plaintiffs and their brothers when they made the improvements had actual knowledge of defendant's title or possessed such information as to put an ordinarily prudent man on inquiry, are as follows: The witness, M. D. O'Donnell, a brother of plaintiffs and one of the grantees in the deed of Mary E. O'Donnell, testified that he was ten years of age at the time his sister purchased the property from Kinney; that plaintiff Richard O'Donnell was thirteen years old at that time and plaintiff Michael O'Donnell eighteen years; that the plaintiffs are bachelors who make their home in Jackson county; that on account of the condition of the health of one of the plaintiffs, Richard O'Donnell, the latter and the other plaintiff had gone to Arkansas; that Michael O'Donnell had accompanied Richard, who was seriously ill, in order to "take care of him;" that plaintiffs were unable to be present at the trial on account of the serious illness of said Richard. No question was asked the witness in relation to the subject of why plaintiffs' deposition were not taken. The witness testified that he looked after the affairs of his brothers.

The witness further testified that when he and his brothers purchased the land from their sister, they believed that they were acquiring a fee-simple title absolute, the deed purporting to convey such estate; that he and his brothers came to the vicinity of the place in 1882 and moved upon the place a year and a half afterwards; that Mr. and Mrs. Mathews lived about a half of a mile distant; that he would meet them frequently but the question of title was never discussed with them or with anyone else at that time; that sometime after "we bought the place" they heard it rumored "that the Mathew children would get that place;" that they first heard this rumor "when Jennie became of age and then when she would die, and finally when Mrs. Mathews would die . . . they would get possession of it;" that—

"We never paid any attention to it. We just thought there was a little *animus* there because we were on the place, Mr. Hock, and that is the reason I never tried to impress it on my mind. But I will not say any time after we bought the place or it might be previous to that time that this rumor, I wouldn't say about it.

"Q. It might have been before? A. It might have been a little prior before that, or it might have been a good while afterwards. It was rumored along at different times that they would finally get possession of that place, but as I told you we didn't believe and never paid any attention to it.

"Q. As a matter of fact, it was general neighborhood gossip down there, wasn't it? A. No, sir, I don't think it was hardly. I only remember one instance where I learned this question, that *animus* there because we were on the place, Mr. Minershagen of Levasy that Mathews would finally get that place. Now that is the only one.

"Q. When was that Mr. O'Donnell? A. Oh, that was not so very long before Mrs. Mathews died. Maybe three or four years."

He denied that the matter was discussed by members of his family "from 1882." The first "specific" rumor that he received of the claim was when the postmaster, Mr. Meinershagen of Levasy, stated that the Mathews' children would get the property. In reference to this question the witness further testified—

"Q. You say you might have heard rumors that the Mathews were going to take that place. You can't recall but it might possibly have been something to that effect before you boys bought the place from your sister? A. There might have been, Mr. Gossett. It has been so long and those rumors you would hear would be scattered over a considerable period. Just occasionally they would get that information out, as we took it, you know. I couldn't say how long, but we didn't pay any attention to it, as I said awhile ago.

"Q. Why did you say you didn't pay any attention to it? A. Because we just thought it was kind of a scheme they had against us, kind of sore at us because we—

"MR. HOCK (interrupting): We object to what he thought.

"MR. GOSSETT: Wait a minute: he has got a right to state it. A. (continuing)—because we was on that place. They had no other grounds, Mr. Gossett. We were neighbors and treated them fairly and we felt when they felt that way toward us it was just jealousy because we were on that place and we never paid any attention to that rumor. That is all there is to it."

A number of defendant's witnesses testified that there was a general rumor in the neighborhood, from the time of the decision in the case of Kinney v. Mathews, supra, that the Mathews children would get the land on the death of their parents and that this information was brought home to plaintiffs and their brothers during the time

of their tenancy on the place and before they placed the improvements upon it. Even if this be admitted to be a proceeding in equity, as the evidence on the question was conflicting we would not be justified in interfering with the conclusions of the trial court. [Hunnell v. Zinn, 184 S. W. 1154, 1157.] The question of good faith was fairly and thoroughly submitted to the jury by both plaintiffs and defendant, defendant having two instructions on the subject.

It seems to be defendant's contention that the testimony of M. D. O'Donnell, even standing alone, as a matter of law, shows that he and his brothers had actual knowledge of the true title or were possessed of sufficient information to put an ordinarily prudent person upon inquiry when they made the improvements. This witness testified that there were same rumors of an indefinite nature concerning the question but that they paid no attention to this because they regarded it as spite or jealousy. If these so-called rumors were merely idle talk or gossip by persons who had no interest in the land, they were not such, as a matter of law at least, to put one on notice. [29 Cyc. 1115.] We have examined the case of Sires v. Clark, supra, cited by the defendant. The court in that case, l. c. 539, 540, approved an instruction on the subject of "general report of the neighborhood" in cases of this kind in which it was submitted that if plaintiff did not know of such report, it could not affect him. Complaint was made by the defendants of this instruction but the court approved it. The court did not and could not have held that if plaintiff knew of such report he could not recover. The decision was merely that if he did not know of the report, it could not affect his rights in any event.

It is insisted that the improvements that plaintiffs sue for were merely ordinary repairs. In this connection it is pointed out that when plaintiffs went into possession of the property it was improved with a house upon it, with out-buildings, an orchard and well, and was fenced. We think that all the items sued for come properly under the head of improvements and not repairs. The clearing was done in order to put a portion of the part cleared in a state of cultivation. A new barn and wells were constructed and a summer house, granary and orchard made, the fencing and iron tank were new. The original roof on the building was of clapboards or home-made shingles. It had been repaired a great many years but finally got beyond a repairable state and plaintiffs and their brothers replaced it with a galvanized corrugated tin roof. The following authorities support the contention that all of the things done to the premises were improvements and not repairs. [Sires v. Clark, supra, l. c. 538; Cunningham v. Anderson, 107 Mo. 371, 374; Bobb v. Wolff, 54 Mo. App. 515; Gallenkamp v. Westmeyer, supra, l. c. 683, 689; Soward v. Leggatt, 7 Car & P. (English) 613; Devine v. Charles, 71 Mo. App.

210, 213, 214; Oil Co. v. Richardson, 63 Pa. 162, 166; Dwight v. Ludlow Mfg. Co., 128 Mass. 280.]

It is insisted that the court erred in instructing the jury to find for plaintiffs for defendant's proportion of the taxes paid by them for the year 1915 and subsequent years. There is no merit in this contention. [Stark v. Kirchgraber, 134 Mo. App. 211.] It is claimed that in any event plaintiffs could not recover for taxes paid for the year 1915 for the reason that these taxes accrued the previous year and should have been paid by the life tenant. While the taxes payable in the year 1915 were assessed during the running of the life tenancy, they were not due and payable until after Mrs. Mathew's death and the life tenant was not chargeable therewith. While the petition does not ask for taxes, the stipulation provided that taxes should be considered as an element of recovery and there was no objection to the proof of the taxes on the ground that they were not pleaded. From an examination of the whole record, it is apparent that the case was tried upon the theory that they were pleaded and, therefore, defendant is not in position now to complain that they were not. [Bammert v. Kenefick, 261 S. W. 78, 82; Tebeau v. Ridge, 261 Mo. 547, 559.]

It is insisted that the trial court erred in instructing the jury to fix the value of the improvement as of the date of the sale of the land under the judgment for partition, to-wit, on May 5, 1922, instead of the date of the termination of the life estate, and erred in instructing the jury to fix the rental value of the property at what it would have been had no improvements been made. There is no merit in this contention. [Byrne v. Byrne, 289 Mo. 109; Armor v. Frey, 253 Mo. 447, 449.] If there is anything to the contrary in Stump v. Hornback, 109 Mo. 272, it has been overruled by the two cases cited.

It is insisted that the jury only allowed defendant $2382 for rents and profits while one of plaintiffs' witnesses placed the rental value at a much higher figure and defendant's witnesses placed it at even a greater amount. It is true that one of plaintiffs' witnesses so testified but another of plaintiffs' witnesses testified to the effect that the rental value of the place during the years in controversy was $2956. This was the value of the land, including the improvements placed upon it by plaintiffs. Defendant was entitled to only 5214/6300 of the rental value of 114-1/3 acres and 2064/6300 of 4-2/3 acres, exclusive of improvements. Based upon the testimony of the witness last mentioned, defendant's shares of the rental value, giving him the benefit of the improvements, is $2307.69, which is less than the jury allowed. Although the jury allowed nothing for defendant's claim for waste, there is some question as to whether the lumber that was sold off the property was sold prior to the time plaintiff and their brothers purchased the land or afterwards, and this item of alleged

666

waste is not mentioned in the answer or in defendant's instructions although defendant offered and had given an instruction on the question of waste. As to the other matter that defendant mentions in his brief, under the head of waste, the evidence shows that the plastering which was found off of several rooms shortly after the termination of the life estate, was caused by the vibration from four or five pipe lines, eight to twelve inches in diameter, running through the premises, about a quarter of a mile distant from the dwelling. Oil, under 600 pounds pressure, was being pumped through these lines by a pump located about three miles away at a pumping station. Defendant states that it was impossible for the plastering to be caused to fall by such means. It must be borne in mind that this was a very old brick house and the plastering presumably had been on from the beginning and we are not prepared to say that the testimony is so at variance with the common experience of mankind as to be wholly unbelievable.

The judgment is affirmed. *Arnold, J.,* concurs; *Trimble, P. J.,* absent.