L. R. JONES and Myrtle Jones, his wife, Plaintiffs-Appellants,

v.

DES MOINES AND MISSISSIPPI RIVER LEVEE DISTRICT NO. I, a Corporation, Defendant-Respondent.

No. 31398.

St. Louis Court of Appeals.

Missouri.

July 16, 1963.

J. Andy Zenge, Jr., Canton, for appellant.

Louis F. Cottey, Lancaster, Craig Hiller, Kahoka, for respondent.

BRADY, Commissioner.

The appellants, plaintiffs in the trial court, brought this action seeking damages for the alleged flooding of their land by the respondent levee district, defendant in the trial court, and also praying for injunctive relief to prevent the defendant from allowing water to stand on their property. The trial court denied plaintiffs both damages and the injunctive relief sought and from that judgment they have prosecuted this appeal.

The defendant district is located in the northeast corner of Clark County and contains an area of approximately 12,000 acres. It was formed in 1903, and in 1923 and 1927 the pumping station and other improvements were added. Just outside the southeast corner of defendant's actual boundaries is located the Town of Alexandria, Missouri, and in that town lies the land owned by the plaintiffs. This is not the first time the drainage problems attendant to this area have caused reference to the courts. See Jones v. Chicago, B. & Q. R. Co., 343 Mo. 1104, 125 S.W.2d 5.

The pertinent portions of plaintiffs' petition are that they therein allege their ownership of Blocks 28, 61, and Lot 1 of Block 59, of Alexandria, Clark County, Missouri, and that defendant had " * * caused, suffered and permitted water to overflow, cover and stand upon * * * " this property; that defendant was asked to remove the water and " * * * made no effort to do so * * *." Plaintiffs' damages were prayed as $7,500.00. In Count II of their petition, plaintiffs allege this conduct on the part of the defendant has continued "for several months"; repeated requests of the defendant to remove the water and repeated refusals of defendant to do so; that defendant's actions

"Constitutes a continuing trespass * * " which makes it impossible for plaintiffs to use a portion of their land; and that the plaintiffs are without an adequate remedy at law. Plaintiffs prayed for an order " * * * restraining and enjoining the defendant * * * from flooding the land * * * and enjoining them from causing, suffering or permitting the water to overflow and flood the land belonging to the plaintiffs * * *."

The answer to Count I admitted the ownership of the lands set out in the petition, except those " * * * which are within the natural boundaries of Keg Slough," and denied the remaining allegations. The answer then sets out at length the defendant's contention that Keg Slough is a natural watercourse into which drained the surface and overflow waters from the surrounding area and in which slough also collected seep water when the Des Moines and Mississippi Rivers rose to or above the level of the bottom of this slough; that this slough had overflowed on numerous occasions prior to this; and, although the plaintiffs' land and the Village of Alexandria were outside of the defendant's boundaries, the defendant had voluntarily constructed a series of levees to protect them and in so doing " * * * and in regularly pumping from said Keg Slough and emptying outside said levees waters which would otherwise accumulate therein and overflow upon plaintiffs' property, without cost to plaintiffs * * * ", defendant has been able to minimize this flooding. Defendant also alleged that whatever flooding occurred was the result of " * * the natural and inevitable overflow of said Keg Slough * * *." The answer went on to plead that by the continuous adverse and uninterrupted use of Keg Slough " * * * as a natural watercourse and as an integral part of its established drainage system * * * " and the collection of the waters therein for more than 25 years preceding this action, the defendant " * * * has acquired by prescription the right and privilege to use said slough

and the banks thereof and the ground immediately adjacent thereto to a point coterminous with, and established by, the high water mark of said slough in rainy and overflow seasons, for the purpose of storing and permitting the natural flowage of the waters from its established drainage system through said slough as fully and with the same effect as though defendant had obtained from plaintiffs and their predecessors in title the grant of a lawful easement of record for such purposes in and upon said slough and the lands immediately adjacent thereto. * * *" The answer to Count I also alleged that the plaintiffs knew the slough overflowed when they purchased the property and that they had deliberately increased any damages by the location of certain personal property in places where " * * * the same were certain to be inundated by the overflow waters from said slough in wet seasons * * *." The final allegation of the answer was that surface seepage and flood waters would cause the slough to overflow when either of the rivers was at flood stage regardless of the drainage by the defendant into the slough.

For its answer to Count II, the defendant re-alleged the matter set out above from its answer to Count I and also denied the lack of an adequate remedy at law. In the alternative the defendant set forth what it refers to in its brief as "The comparative injury rule" alleging that the damage to it and " * * * to the public which it represents and serves * * * would be grossly disproportionate to any possible benefit which plaintiffs could obtain thereby and * * * would cause irreparable damage and detriment to defendant's entire drainage plan and system. * * *"

■ The scope of our review is too well known to require citation. We are to review this jury-waived case as we would an equity matter arriving at our own conclusions of law and findings of fact but duly deferring to the trial court's ability to judge the credibility of the witnesses. We are not to set the judgment aside unless it is clearly erroneous. Sec. 510.310, RSMo 1959, V.A.M.S.

The transcript discloses that essentially there were two issues litigated in this trial. The first was as to the water standing on Block 30 and those parts of Blocks 28 and 61 lying inside Keg Slough. The second issue was as to whether the defendant was liable for damage caused to plaintiffs' personal property standing on Blocks 28, 61, and Lot 1 of Block 59 and lying outside the banks of Keg Slough, by water overflowing the banks of Keg Slough. As to the first issue, the defendant's contention was that it had acquired the right to flood that land by prescription or, in the alternative, that these portions of plaintiffs' land lie within the banks of a natural watercourse. The plaintiffs contended that defendant was barred from pleading any prescriptive right, from introducing any evidence as to the acquisition of such a right, and from claiming that Keg Slough was a part of a natural watercourse by what they designate as "res judicata." It is in this connection that plaintiffs present three of its five allegations of prejudicial error. Therein plaintiffs contend that the trial court erred in overruling their motion to strike those paragraphs from the answer which set forth defendant's contentions that this slough is a part of a natural watercourse to which the defendant had acquired a prescriptive right, in admitting evidence as to the slough being a part of a natural watercourse, and in admitting evidence as to the existence in defendant of a prescriptive right. The plaintiffs also assign as error the trial court's action in allegedly refusing to take judicial notice that in yet another action tried before the court wherein the town of Alexandria was plaintiff and sought to drain waters into Keg Slough, the defendant took the position that Keg Slough was a private drainage ditch. Plaintiffs contend this allowed the defendant to adopt inconsistent positions to plaintiffs' preju-

·dice. The plaintiffs' last allegation of error is that the evidence conclusively requires a judgment in their favor. In view of the result reached herein, there is no necessity to state plaintiffs' evidence as to damage.

The evidence in this case can best be understood by reference to plaintiffs' exhibit No. 1, set out above. A surveyor employed by plaintiffs testified that he had surveyed and platted plaintiffs' land as it is shown on that exhibit. He testified that when he went upon the property for this purpose, he saw frozen water extending over much of the northwest portions of Blocks 28 and 61; that he placed iron pipes at the places shown on the exhibit by driving the pipes through the ice and water where necessary; that about a week prior to trial, he returned to view the scene and found this frozen water around the northeast and southeast corner markers on Block 28 and the rest of the water located as it was when he placed the markers. He described the water as being contiguous and one body of standing water. He testified that the purple wavy lines on Exhibit 1 indicate the natural banks of Keg Slough which does have well-defined banks, and drew on that exhibit the representations of buildings which appear on Lot 1 of Block 28 and Lot 1 of Block 59 and placed an "X" on the southwest corner of Block 61 where he saw "a pile of tires" which were at the water's edge. He also testified that he saw piles of lumber and old bathroom fixtures stacked near the bank. The plaintiff later testified he stacked lumber and used plumbing fixtures from the "X" at the southwest corner of Block 61 eastwardly

along the bank to the back of his house on Lot 1 of Block 28.

The plaintiff, L. R. Jones, testified that he was the owner of the land surveyed by Fleming and depicted in Exhibit 1 and was present when the survey was made; that on the date of the trial, water stood " * * six feet or eight feet * * *" from the marker at the northeast corner of Block 28 and, with reference to the banks of Keg Slough, water has extended over the bank southwardly over his land lying outside of the banks as much as twenty feet. He was asked the following question and gave the answer shown: "Q Since the 5th of October, 1960, when a decree was entered in this court to the effect you hold title to all of 28 and Lot 1 in 59 and all of Block 61 and also all of Block 28, has there been a time since then there hasn't been some water standing on a part of Block 61 and a part of Block 28? A That's right." His further testimony was that his property was located about 2 miles from the defendant's pumping station; that water brought down to the pumping station from the upper part of the drainage district backs up into Keg Slough if it is not immediately pumped out; that in June and July of 1960, water "was over a good part" of his property; that when this occurred, the Mississippi River was "down" although there had been high water on that river and on the Des Moines River in the first part of April; that from " * * * the last of March up to about the 4th or 6th * * *" of April the river stage at Alexandria was "21 feet and better, maybe * * *"; that during this time there was water in the slough but none " * * * up around my buildings or in my lumber pile or on the road." The witness identified plaintiffs' exhibits, stated what each portrayed, and testified that as to those exhibits showing water on his property and on the road leading to it, they depicted areas that had no water on them when the river was " * * * at its height in the last of March and first of April, 1960." Mr. Jones further testified that it rained on the 23rd of June and that on the 24th, 25th and 26th there

was water on his property outside the banks of Keg Slough; that water was on this property the 30th of June and from the 2nd through the 5th of July; that the water got so deep between his house and dry ground that he could not get out with a pickup truck; that he spoke to defendant's superintendent, Renner, and to a Mr. Joyce and Mr. Morgan who he identified as "members of the levee district"; and that Morgan told him they wanted to leave the water in the slough. He was asked whether water had been on his property ever "Since the decree was entered in this court in the quit title suit, being No. 19652 in the Circuit Court of Clark County, Missouri * * *" except for a time in September and October. He testified that it had and that the water goes down when the defendant operates his pumps.

On cross-examination, the plaintiff Jones testified that as to Block 59, he owned only Lot 1; that during all of the time he has owned the property to which he held title at the date of this trial, there was water inside the banks of Keg Slough except in 1953 when " * * * she was bone dry" for " * * * I'd say, two months"; and that the events he described on the named days in June and July of 1960 were the only times water got out of the slough banks and over his land so far as he knew since 1914. Plaintiff further testified that he "dumped some stuff" in the slough along its banks as those banks cut across his property in Blocks 28 and 61 and he had a bulldozer level it off; that his efforts in this manner resulted in building the banks of the slough 8 or 9 feet further out into the slough. Upon continued cross-examination, it was further developed that on June 23rd, plaintiff went to the pumphouse and told Renner the water was coming up. Renner told him to take his motors off; that the water was going to get a lot worse. The pumps were running every time he went to the pumphouse.

The defendant's first witness was William Klingner, a professional civil engineer spe-

cializing in land drainage, who occupies the position of consulting engineer with defendant. This witness testified that over the whole drainage district there was only a 15 foot differential in elevation with the low ground being along Keg Slough; that in his opinion, this whole area was once a part of the flood plain of the Des Moines, Fox and Mississippi Rivers and the sloughs now found in the area were once part of the Des Moines River channel although he thought that Keg Slough was once an arm of the Mississippi River; that the natural drainage of this area, as shown by the land contours, is through Hill Slough, Goose Slough, Hemp Slough, Lenard Slough and Keg Slough, into the Fox River; that these sloughs and Dry Slough were all connected, "* * * a continuous chain of sloughs * * *", running about 9 or 10 miles in length from the northern part of the district to the pumping station at the southern boundary; that these sloughs have well-defined banks, with islands and bars in Hemp Slough, contained water every time he saw them, and constitute the only natural drainage system in the area. His further opinion was that, referring to the maps made when the defendant district was formed, these sloughs comprised a natural watercourse and, prior to the erection by defendant of its levee at the south end of Keg Slough, the natural outlet for water in Keg Slough was into the Fox River.

The witness Evans, an employee of the Corps of Engineers, U. S. Army, located at Lock 19 at Keokuk, Iowa, testified that his duties embodied the keeping of records as to rainfall and river stages; that the highest stage the Mississippi River ever attained was 21.83 on April 4, 1960; that 16 feet is flood stage; and that on June 23rd in 1960 the reading was 10.07 which was the highest reading in June or July of that year. This witness testified that he had made a detailed study of water run off from drainage districts and that in an area having a 36 inch rainfall the usual run off is about 6 inches. However, due to the peculiar soil structure of the area in question resulting

in a high water table and heavy saturation of the subsoil, the run off in this area was increased by about 4 times, to 24 inches. In his opinion Keg Slough would have overflowed on more occasions than it did had it not been for the defendant's pumps. On cross-examination, Klingner testified that Keg Slough is and has been a place for water to back up into when it reaches the pumping station and is not pumped out; and that the water level at the Jones' property is "completely and entirely" affected by the water level at the pumping station. The witness testified that from the 2nd of June through the 23rd of that month it rained at least a trace on 13 days. The dates and respective amounts given were as follows: "On the 2nd 1.63 inches; on the 5th, .17 of an inch; on the 11th, .02 of an inch; on the 12th, .44 inch; on the 13th, 1.35 inches; on the 14th, .3 of an inch; on the 16th, .32 of an inch; on the 17th, .02 inch; on the 18th, a trace; on the 19th, a trace; on the 21st, 1.49 inches; on the 22nd, .06 inch; on the 23rd, 3.7 inches."

Mr. French, a consulting civil engineer, concurred in the previously expressed opinion that these sloughs comprise an interconnected natural drainage system for this area, draining it into the Fox River, and gave other testimony cumulative in nature. Upon cross-examination, he testified that the ditches dug by the defendant had the effect of bringing more rapidly and by increased flow the water that would have reached the pumping station in any event.

The witness, Kirchner, age 74 and a lifelong resident of Clark County, testified he had known of Keg Slough since he was 11 years old and the only time he knew of it being dry was about 5 or 6 years prior to trial. Frank Gates, another old resident of the area, testified that Pickle Factory Slough and Keg Slough were one and the same and that he had only seen Keg Slough dry once and the rest of the time it had water flowing or standing in it. Mr. Bilbo, who had lived in this area for 62 or 63 years and who lived about 1½ blocks from the plaintiffs, testified that the one time he saw the

slough dry, "It had just a little down the middle. Might as well say it was dry." His further testimony was that if water remained at the pumping station, "It might back up in small amounts * * *" toward the plaintiffs' property. Mr. Young, a member of the defendant's Board of Directors, testified that when the water from the rest of the district comes down to the pumping station and is not pumped out, it goes in three different directions, one of which is to back up toward plaintiffs' property. He stated that before plaintiffs owned this property, he saw it flooded once by overflow of Keg Slough and that was on the occasion of a 9 or 10 inch rain in a 24-hour period. This comprised the defendant's case.

Rebuttal evidence consisted of the evidence of the witness Simmons that in the three years of 1916, 1917 and 1918 when he lived a block south of the plaintiffs' property, Keg Slough was dry " * * * outside of a little seep water in the spring. That entire pond was dry"; that in one of those years someone had a pickle patch even with plaintiffs' house; that he walked across Keg Slough in those years to get to work; and that, since the defendant dug the ditches in the district, there has always been water in the slough. Mrs. Simmons testified that some 50 years ago she had picked mustard greens where the water now stands within the banks of Keg Slough.

The trial court found that Keg Slough, together with the other sloughs mentioned in the evidence, comprised a natural watercourse; that the defendant had the right to direct its drainage waters into Keg Slough; that it did not do so in an unreasonable or improper manner; that plaintiffs sustained no compensable damage by reason of the defendant's action; and that plaintiffs have no right to " * * * enjoin or otherwise restrict or interfere with the lawful use of said natural watercourse by defendant in the manner disclosed by the evidence."

We will first consider the plaintiffs' allegations of error based upon "res judicata". That term is one of common usage, referring to what is more accurately denominated "estoppel by judgment," Ratermann v. Ratermann Realty and Inv. Co., Mo.App., 341 S.W.2d 280, l. c. 290. Generally speaking, identity of the thing sued for, identity of the cause of action, identity of the persons and parties to that action, and identity as to the quality of the person for or against whom such a claim is made are essential elements of such a plea. The term may be applied to a judgment or, as plaintiffs seek its application in the instant case, as to some particular fact or issue litigated between the parties. Norwood v. Norwood, 353 Mo. 548, 183 S.W.2d 118 and cases cited at [4] p. 122. The rule in this state is that where he has the opportunity, a party must plead his contention of "res judicata" whether it is used to set up the former judgment as a bar or where, as here, it is sought to assert the conclusiveness of some issue previously litigated and decided. O'Donnell v. Mathews, 221 Mo. App., 657, 284 S.W. 204, l. c. 206 [2] and cases cited on p. 207; Rutherfurd v. Farrar, Mo., 112 S.W.2d 847, transf., Mo.App., 118 S.W.2d 79 [1]; see the annotation in 120 A.L.R. at p. 55, n. 47. There was certainly no such pleading contained in the petition. Moreover, this record is bare of any proof as to this previous trial. The transcript fails to show the offer of any evidence of the record of such trial and no exhibits pertaining thereto have been made a part of this record. Such matters must be pleaded and supported by evidence, Snyder v. Jensen, Mo., 281 S.W.2d 819 [1, 2]. Sec. 509.090, RSMo 1959, V.A.M.S.; 17A Mo. Digest, Judgment ☞948(1); see the Missouri cases collected in 120 A.L.R. p. 55 n. 47, p. 63 n. 48, p. 65 n. 50, and p. 66 n. 51. For other specific rulings upon the point, see Bohannon v. Camden Bend Drainage Dist., 240 Mo.App. 492, 208 S.W.2d 794, l. c. p. 800 at [7], and cases there cited. For these reasons we find plaintiffs' allegations of error with regard to a prior adjudication of certain issues pertinent to this case to be without merit.

Plaintiffs next contend that the trial court erred in not taking judicial notice that in still another action tried before the court, the defendant to the instant action contended that this area flooded by water was a private drainage ditch. As plaintiffs contend, a court can judicially notice its own records and, when justice requires, it should consider the records of other cases before it, Knorp v. Thompson, 352 Mo. 44, 175 S.W. 2d 889, 1. c. 894 [4]. This allegation of error cannot be sustained. Plaintiffs fail to cite and examination does not reveal any instance appearing in this record where the trial court specifically refused to take judicial notice of the prior action. Neither the pleadings nor any of the proceedings in this previous case were presented to the trial court, nor are they a part of this record. If justice required the trial court to take judicial notice of the defendant's prior position absent a showing to the contrary, we must presume that it did so. Moreover, the plaintiffs are not correct in their contention that had the trial court taken judicial notice of defendant's position in a prior action which did not involve these plaintiffs nor the issues here presented it could not have ruled for defendant. As defendant points out what is here involved is, at the most, a quasi admission as distinguished from a true judicial admission. In May v. May, Mo.App., 294 S.W.2d 627, 1. c. 634, the distinction was made clear:

"A true judicial admission is an admission made in court or preparatory to trial, by a party or his attorney, which concedes for the purposes of that particular trial the truth of some alleged fact so that one party need offer no evidence to prove it, and the other party ordinarily is not allowed to disprove it. It removes the proposition in question from the field of disputed issues in the particular case wherein it is made. It is a substitute for evidence in the sense that it does away with the need for evidence on that subject in that cause. (Cases cited.) The true judicial admission is sharply distinguished from the ordinary or quasi admission, which is usually some form of self-contradiction and which is merely an item of evidence, available against the party on the same theory any self-contradiction is available against a witness. The person whose act or utterance it is may nonetheless proceed with his proof in denial of its correctness. It is merely an inconsistency which discredits, in greater or lesser degree, his present claim and his other evidence. It is to be considered along with the other evidence and circumstances of the case. Thus, the moment one seeks to use admissions made in other litigation, even though between the same parties, he must resort to them merely as ordinary or quasi admissions—i. e., ordinary statements or acts which now appear to tell against the party who made them or did them. (Cases cited.) * * *"

It follows that defendant's position in the prior action is, at the most, merely an inconsistency which is to be considered along with the rest of the case in arriving at a judgment. It cannot be held to have prevented the defendant from proceeding in this action to prove that his previous position was incorrect. May v. May, supra. This allegation of error must also be ruled against plaintiffs.

The last allegation of prejudicial error presented by the plaintiffs is that the judgment should have been for them and against defendant " * * * because the evidence conclusively showed that Respondent had collected water and discharged it in greater quantities and force than would naturally have resulted, on Appellants, to their damage, and this is contrary to the law of Missouri."

It is apparent from the factual situation presented in this case that the allegation that the discharge of water was in greater quantities and force than would naturally have resulted is without factual support. So far as the quantity of water is concerned,

the defendant's evidence was that it was substantially the same as would have reached Keg Slough had defendant not dug and maintained its ditches. The "force" of water was in no way involved in this case. There was no contention that this water was caused to flow through these ditches with such acceleration, or discharged with increased force such as through a tube or conduit or some such narrowed opening so as to erode the land.

The plaintiffs' theory in the trial of this case was that the defendant had no right to drain the surface waters from the rest of its district into Keg Slough. Plaintiffs referred to the water in Keg Slough as "collected water." The plaintiffs contended that since defendant lacked the right to do so it was responsible for the damage that resulted. This damage was claimed to have arisen in two ways. First, from the fact that all of Block 30 and those portions of Blocks 61 and 28 lying within the banks of Keg Slough were flooded. The plaintiffs sought injunctive relief to prevent this situation from continuing and also sought damages for the flooding of this land. Second, from the overflow of Keg Slough over its banks and onto the plaintiffs' land lying outside the banks of the slough. In this last regard, the plaintiffs sought injunctive relief to prevent the continuance of this condition, and also sought to recover damages for the interruption of their business, for the flooding of the buildings, and for the damage to their personal property stored along the banks of Keg Slough.

First, let us consider the plaintiffs' allegations with respect to that part of their land lying within the banks of Keg Slough. A natural watercourse was defined in Belveal v. H. B. C. Development Company, Mo.App., 279 S.W.2d 545, 1. c. 551, by the following quotation from Benson v. Chicago & A. R. Co., 78 Mo. 504, 514:

" * * * 'There must be a stream usually flowing in a particular direction, though it need not flow continually. It must flow in a definite channel, having a bed, sides or banks, and usually discharge itself into some other stream or body of water. It must be something more than a mere surface drainage over the entire face of a tract of land, occasioned by unusual freshets or other extraordinary causes. It does not include the water flowing in the hollows or ravines in land, which is the mere surface water from rain or melting snow, and is discharged through them from a higher to a lower level, but which at other times are destitute of water. Such hollows or ravines are not in legal contemplation water courses.' "

The defendant's evidence was that these sloughs were abandoned river channels, connected with each other, showing well-defined banks, dry—even by plaintiffs' evidence—only once or twice in the memory of the oldest residents, and emptying into the Fox River until prevented from doing so by defendant's levee. However, the evidence is devoid of any contention that there was a stream involved here and reference to the maps and plats in evidence indicates that this is not the factual situation. Compare Webb v. Carter, 121 Mo.App. 147, 98 S.W. 776. In St. Louis, I. M. & S. Ry. Co. v. Schneider, 30 Mo.App. 620, it was held that a bayou was not a natural watercourse. In Place v. Township of Union, Mo.App., 66 S.W.2d 584, it was held that a slough which was a natural drain having well-defined banks, feeding other sloughs connecting with a stream at high water and originally emptying into a creek was " * * * something more than a mere temporary conduit of surface water * * * " and, in effect, a natural watercourse. In this case, the defendant's expert testimony and maps illustrate that prior to the erection of defendant's levee, Keg Slough did have a confluence with Fox and Hemp Sloughs and all then emptied into the Fox River. The reasonable inference from the evidence of confluence with other sloughs and a common mouth in the Fox River is that, in greater amount during high water than at

regular flow but nevertheless steadily, these sloughs were fed in part by back-up water from the Fox River. The defendant's evidence as to the peculiar soil structure of this area, the unusual amount of "run off water" and the length of time this slough had existed are also factors to be considered. When Keg Slough is considered in the light of all the evidence, viewed in the light we are to cast upon that evidence, we hold it to be a natural watercourse.

The fact that these sloughs comprising this natural watercourse had ditches dug in them to facilitate the flow of water therein does not change their character. In Happy v. Kenton, 362 Mo. 1156, 247 S.W.2d 698, the court held that a natural drainway improved by an artificial ditch following its course and intended to be permanent should still be treated as a natural watercourse, even though the natural watercourse came into existence with the aid of the ditch.

■ In Haferkamp v. City of Rock Hill, Mo., 316 S.W.2d 620, 1. c. 627, it was held that a party could collect surface water in artificial drains and precipitate it into a natural drainway channel where it would otherwise naturally go. See also the annotation of this question in 28 A.L.R. beginning at p. 1262 and the Missouri cases therein cited. As to agricultural lands, see Young v. Moore, Mo.App., 236 S.W.2d 740. There is no merit in plaintiffs' contentions with regard to the flooding of their lands lying within the banks of Keg Slough, a natural watercourse.

■ When considering plaintiffs' contentions with regard to injunctive relief and damages resulting from water that came onto plaintiffs' land lying outside the banks of Keg Slough, it is necessary to understand the nature of that water. The surface waters drained into Keg Slough ceased to be such when they reached that natural watercourse. Keener v. Sharp, Mo.App., 95 S.W. 2d 648, 1. c. 652. However, when those waters overflowed the banks of that slough the escaping water again became surface water. Goll v. Chicago & A. R. Co., 271

Mo. 655, 197 S.W. 244. As a result of holding Keg Slough to be part of a natural watercourse, the factual situation here presented is not one when there was an attempt to block off this overflow or surface water thereby throwing it onto another's land, but one where the natural watercourse into which surface waters were drained was blocked causing the water to back up, overflow, and become surface water again. Tackett v. Linnenbrink, Mo.App., 112 S.W. 2d 160, 1. c. 163 [4].

In Happy v. Kenton, supra, it was held:

" * * * *Missouri is committed to the doctrine that one may not obstruct a natural watercourse without liability for ensuing damages to others,* but that one may otherwise treat surface waters as a common enemy and obstruct their flow without liability for ensuing damages so long as he does so reasonably and not recklessly or negligently. (Citing cases.)" (Emphasis supplied.)

It would, therefore, be natural to expect the defendant in this case to contend that waters in Keg Slough were surface waters so as to avoid any possible liability for admittedly having placed a levee across this watercourse, causing the waters thereof to overflow the banks of Keg Slough and damage the personal property stored on that land. Likewise, it would be expected that plaintiffs' theory at the trial would be that they were entitled to damages resulting from defendant's blocking of a natural watercourse. The opposite was true throughout this trial. Defendant pled and, as held herein, proved that this was a natural watercourse although it admitted blocking the flow into a confluence with other sloughs and then into the Fox River. Plaintiffs pled and vigorously took the position throughout the trial and before this court that Keg Slough was not part of a natural watercourse. The theory they pursued is best stated in the following language from their brief:

" * * * We believe the law to be in Missouri that a person cannot collect

even surface water and discharge it in great quantities upon another to the other's damage without being liable. We believe this principle of law has been stated many times by the courts of this state, as is illustrated by the case of Belveal v. H. B. C. Development Co., 279 S.W.2d 545, 1. c. 552.

"We believe the court further erred in admitting evidence as to the area in which the water was dumped by the respondent to be a natural water course * * *."

It is elementary that the parties are bound by their theory at trial. Plaintiffs cannot now be awarded injunctive relief to prevent the blocking of a natural watercourse nor damages resulting from that blocking when their theory both in the trial court and on appeal was that Keg Slough was not a natural watercourse.

Even if we were to allow the plaintiffs to pursue a theory upon appeal directly contradictory to their theory at trial, the plaintiffs would still not be entitled to the relief they seek. In Kennedy v. Union Elec. Co. of Mo., 358 Mo. 504, 216 S.W.2d 756, 1. c. 761 [4], it was held that the burden of proof is on the plaintiffs to show that the conditions created by the defendant caused a natural watercourse to get higher than it would have without those conditions and to overflow. Plaintiffs offered no such evidence in this case. There was no showing that Keg Slough got higher after the levee was constructed than it did before, and certainly no evidence that this levee caused the overflow on the occasions in June and July 1960 for which plaintiffs seek damages. The testimony is otherwise. This levee had existed since 1927, yet Mr. Jones admitted this overflow was the first he knew of since 1914. A fair inference from the maps and plats and the testimony of the witnesses is that the banks of the slough were constant and did not move outwardly further into plaintiffs' land after the levee.

Moreover, the defendant's witness, Evans, testified that water would have overflowed plaintiffs' land more often had it not been for the defendant's levee and pumps. Under these facts, the plaintiffs failed to carry the burden of proof on this issue. Kennedy v. Union Elec. Co. of Mo., supra.

The judgment should be affirmed. The Commissioner so recommends.

PER CURIAM.

The foregoing opinion of BRADY, C., is adopted as the opinion of this court. The judgment is affirmed.

WOLFE, Acting P. J., ANDERSON, J., and JACK P. PRITCHARD, Special Judge, concur.