IN RE ESTATE OF HAROLD CLAIR OLSEN, DECEASED.
CHERIE L. OLSEN, PERSONAL REPRESENTATIVE OF THE ESTATE OF
HAROLD CLAIR OLSEN, DECEASED, APPELLANT, V. WILLIAM MARK
OLSEN AND AMERICA OLSEN-SCHAAF, CLAIMANTS, APPELLEES.

579 N.W. 2d 529

Filed June 19, 1998.    No. S-97-208.

Robert M. Harris and Randall L. Lippstreu, of Harris & Lippstreu, P.C., for appellant.

Paul E. Hofmeister, of Van Steenberg, Chaloupka, Mullin, Holyoke, Pahlke, Smith, Snyder & Hofmeister, P.C., for appellees.

WHITE, C.J., CAPORALE, WRIGHT, CONNOLLY, GERRARD, STEPHAN, and McCORMACK, JJ.

WHITE, C.J.

This case presents two issues of first impression: first, whether a deed or other muniment of title is required as evidence where ownership to real property is directly at issue; and second, whether real property tax liability is borne by the estate of the life tenant or by the remaindermen, or is apportioned between the two, where the life tenant dies before the taxes are due and payable.

Harold Clair Olsen (Olsen) died on December 20, 1995, and was survived by his wife, Cherie L. Olsen, the personal representative of Olsen's estate; his ex-wife, Grace Olsen; and his three children, William Mark Olsen, America Olsen-Schaaf, and Susan Olsen-Urtatko. According to the evidence, prior to his death, Olsen owned a life estate in certain real property known as Leafdale Place, and the remaindermen of Leafdale Place were William and America.

The 1995 real property taxes became due and payable on December 31, 1995. See Neb. Rev. Stat. § 77-203 (Reissue 1996). America paid the 1995 real property taxes on April 30, 1996. William and America then filed a statement of claim against the estate in Banner County Court, seeking reimbursement for the taxes which had accumulated through the date of Olsen's death. Cherie disallowed the claim, and in turn, William and America filed a petition for allowance of claim. Cherie demurred, claiming that the petition failed to state sufficient facts to constitute a cause of action and that the claim was barred by Neb. Rev. Stat. § 30-2485 (Reissue 1995). On July 8, 1996, the county court overruled the demurrer, and on July 29, Cherie filed her answer and generally reasserted the same allegations as contained in her demurrer. The case proceeded to trial on October 11.

During trial, Grace and Cherie both testified that Olsen was the life tenant of Leafdale Place and that William and America were the remaindermen. Counsel for the estate objected to this testimony, stating, "Your Honor, I'm gonna object to this — is not proper evidence. I think if there is a life estate — a remain-

der interest here, it could be established by documentary evidence . . . ." The county court overruled the objection and permitted the line of questioning to continue.

Grace and Cherie then testified regarding the legal description of Leafdale Place and the identities of the remaindermen; counsel for the estate again objected. The court overruled the objection, but noted it as a continuing objection. At the close of the evidence, the county court found generally in favor of William and America in the amount of $3,022.69 (said amount representing the amount of the 1995 real property taxes having accrued up to the date of Olsen's death). The estate filed a motion for a new trial, which was overruled, and this appeal followed.

Rephrased and summarized, Cherie contends the county court erred in (1) receiving Grace's testimony into evidence; (2) overruling the demurrer; (3) failing to find that real property taxes were not due and payable until December 31, 1995, pursuant to § 77-203; (4) finding that William and America paid the 1995 real property taxes when in fact a volunteer paid them; (5) finding that William and America's claim was not barred by § 30-2485; and (6) failing to find that Olsen's right to receive income and his obligation to pay real property taxes terminated on the day of his death.

Cherie initially argues that the county court erred in admitting into evidence Grace's testimony regarding the existence of Olsen's life estate and the identities of the remaindermen because William and America did not produce documentary evidence to substantiate Grace's testimony. William and America respond by claiming that the testimony offered by Grace was sufficient, competent evidence and that if Grace's testimony was incorrect, the estate could have offered evidence to dispute her testimony, but the estate did not do so. William and America correctly note that during trial the personal representative, Cherie, admitted the existence of the life estate and the identities of the remaindermen.

The outcome of this issue is governed by generally accepted, well-settled principles of law. It has been stated that

[i]n cases involving questions of title, ownership, and right to possession in the proof of deeds, leases, and mort-

gages and other instruments of title, the best evidence rule requires that the instrument itself be produced, unless a sufficient foundation is laid for the production of secondary evidence of the contents of such instrument, such as by showing its loss or destruction or that it is in the possession or control of an adverse party who has neglected to produce it after notice to do so.

29A Am. Jur. 2d *Evidence* § 1077 at 537 (1994). See, also, 32A C.J.S. *Evidence* § 1077 at 438 (1996) (stating that "where the title to real property is in issue, the deeds . . . wills . . . or other muniments of title constitute the best evidence, and parol evidence is not admissible to prove title unless their absence is satisfactorily explained"); 73 C.J.S. *Property* § 35 at 233 (1983) (stating "the proper way to prove title to property is to submit into evidence original documents or certified copies from the record").

Many jurisdictions support this general principle of law. See, e.g., *Yates v. State*, 206 Tenn. 118, 332 S.W.2d 186 (1960); *Kimble v. Newark*, 91 N.J.L. 249, 102 A. 637 (1917); *Collar v. Collar*, 86 Mich. 507, 49 N.W. 551 (1891). For example, in *Bond v. Benning*, 175 Conn. 308, 398 A.2d 1158 (1978), the Connecticut Supreme Court addressed an action for an injunction and to quiet title to a certain parcel of property. The defendants disputed the plaintiffs' claim to title. The court rejected the defendants' claim and stated that "[t]he proper way to prove title is to submit into evidence original documents or . . . certified copies from the records." *Id.* at 312, 398 A.2d at 1160. The court concluded that the lower court was not in error in concluding that the plaintiffs had established ownership of the land in question by producing record title.

Similarly, in *Moe v. Chesrown*, 54 Minn. 118, 55 N.W. 832 (1893), the Minnesota Supreme Court addressed a trespass action filed for injuries to real property. At trial, the plaintiff testified that he was the owner and possessor of the property in question. The court rejected the plaintiff's testimony and reasoned that since the question of the plaintiff's title was directly in issue, title could not be proved by parol evidence. Therefore, the court ruled that the trial court improperly allowed the plaintiff to testify generally that he was the owner.

Likewise, in *Neal v. Dover*, 217 Ga. 545, 123 S.E.2d 760 (1962), the Georgia Supreme Court addressed an ejectment action wherein the defendants claimed ownership to the property in question because the plaintiffs' title was a deed to secure a debt instead of an absolute deed. The defendants claimed the trial court erred in refusing to allow a witness to testify regarding title to the property. The court initially stated that the highest and best evidence of title was the original deed, which was stipulated to in the evidence and did not have to be proven further. In turn, the court ruled that the trial court properly refused to allow the witness to testify as to his knowledge that the plaintiffs had title to the property.

In *Taylor v. Continental Southern Corp.*, 104 Cal. App. 2d 435, 233 P.2d 583 (1951), the court addressed a situation in which a defendant oil company claimed an interest in land leased to it by the plaintiff landowner. The court stated that where a lessor bases his or her testimony as to ownership upon deeds which are available and could be produced, the deeds are the best evidence as to the provisions therein. The court ultimately ruled that the trial court did not commit prejudicial error in striking such testimony. See, also, *Viccaro v. City of Ft. Wayne*, 449 N.E.2d 1161, 1164 (Ind. App. 1983) (holding that "[t]itles to property granted by deeds . . . are the best evidence of ownership of real property"); *Kingsley v. United States,* 569 S.W.2d 241, 242 (Mo. App. 1978) (holding "[i]t has long been the law of this state that evidence of title cannot be established by parol evidence"); *Olander v. City of Omaha*, 142 Neb. 340, 6 N.W.2d 62 (1942) (holding that warranty deed conveying property in joint tenancy and not as tenants in common and vesting entire title in survivor was best evidence of interest and title); *Littlefield v. Bowen*, 90 Wash. 286, 291, 155 P. 1053, 1055 (1916) (holding that "when the title to real estate is directly in issue, the best evidence of title consists in the muniments of title such as deeds, mortgages, patents, wills, etc.").

In the case at bar, the existence of the life estate and the identities of the remaindermen were directly at issue and contested by Cherie. No will, deed, or other muniment of title or ownership indicating the existence of the life estate or the identities of the remaindermen was received in evidence. As such, no basis

was shown to support the ownership claims or the identities of the remaindermen.

Cherie next argues that the county court erred in failing to sustain the demurrer, because real property taxes which become due and payable after the death of a life tenant are the duty of the remaindermen. Cherie further argues that apportioning tax liability is inappropriate. William and America respond by arguing that while the 1995 real property taxes were not due and payable until after Olsen's death, equity demands that such real property taxes be apportioned between the life tenant's estate and the remaindermen. Cherie's and William and America's arguments present the second issue of first impression: whether real property tax liability should be borne by the estate of the life tenant or by the remaindermen, or should be apportioned between the two, where the life tenant dies before the taxes are due and payable. Addressing this second issue leads this court to the question of whether the county court erred in denying Cherie's demurrer.

In an appellate court's review of a ruling on a general demurrer, the court is required to accept as true all the facts which are well pled and the proper and reasonable inferences of law and fact which may be drawn therefrom, but not the conclusions of the pleader. *Billups v. Scott*, 253 Neb. 287, 571 N.W.2d 603 (1997); *Galyen v. Balka*, 253 Neb. 270, 570 N.W.2d 519 (1997). A demurrer will be sustained where the petition does not state facts sufficient to constitute a cause of action. See Neb. Rev. Stat. § 25-806(6) (Reissue 1995). A statement of "facts sufficient to constitute a cause of action," as used in § 25-806(6), means a narrative of events, acts, and things done or omitted which show a legal liability of the defendant to the plaintiff. *Giese v. Stice*, 252 Neb. 913, 567 N.W.2d 156 (1997).

This court has held that as between the life tenant and the owner of the fee, it is the duty of the former to pay all taxes *charged* against the land during the continuance of the estate. *Spiech v. Tierney*, 56 Neb. 514, 76 N.W. 1090 (1898). In *King v. Boettcher*, 96 Neb. 319, 147 N.W. 836 (1914), we stated that a life tenant of lands is charged with the duty of paying the taxes which *accrue* upon the property of which he is enjoying the use, rents, and profits. Likewise, in *Disher v. Disher*, 45 Neb. 100,

63 N.W. 368 (1895), we said that as between the heirs and the tenant for life, it was the duty of the latter to pay all taxes *assessed* against the land during the continuance of the estate.

In Nebraska, real estate taxes are not charged, accrued, or assessed until December 31, following the prior year. Section 77-203 provides that

> [a]ll general real property taxes levied for any county, city, village or other political subdivision therein, shall be *due and payable* on December 31 next following the date of levy thereof, and commencing on that date shall be a first lien on the real estate taxed until paid or extinguished as provided by law.

(Emphasis supplied.) Real property tax liability rests with the owner or owners of the real property at the time real property taxes are charged, accrued, or assessed, i.e., "due and payable."

Our holding in *Whiteside v. Whiteside*, 159 Neb. 362, 67 N.W.2d 141 (1954), amplifies this point. *Whiteside* involved a parcel of land owned in joint tenancy with right of survivorship. On October 12, 1952, one of the joint tenants died. On March 5, 1953, the remaining joint tenant, the plaintiff, paid $129.52 for the 1952 real estate taxes. The plaintiff filed a claim for an allowance of the $129.52, and the decedent's estate objected. The plaintiff then petitioned the county court for the $129.52; the court sustained the objection and disallowed the payment. The plaintiff appealed, and we affirmed. In so doing, we determined that pursuant to § 77-203, the 1952 real estate taxes were "not due and payable and did not become a lien or encumbrance on the property until January 1, 1953, next following the levy thereof, long after plaintiff had become the sole owner of the real estate which was never any part of the estate." 159 Neb. at 366, 67 N.W.2d at 144. Thus, we determined that the county court properly refused the credit for the allowance.

Regardless of our holding in *Whiteside*, William and America claim that real property tax liability should be equitably apportioned between the estate of the life tenant and the remaindermen. However, although the *Whiteside* court was not directly presented with the issue of apportioning real property tax liability, we find it noteworthy that the court could have apportioned the taxes between the estate and the remaining joint ten-

ant, yet chose not to do so. Many other jurisdictions support the proposition that real property tax liability should be determined based on ownership status at the time the taxes become due and payable and, more importantly, that apportionment should be disallowed. See, *In re Estate of Luke*, 184 N.W.2d 42 (Iowa 1971); *Foulks, Exr., v. Talbott, Exr.*, 74 Ohio App. 281, 58 N.E.2d 790 (1943); *Ind. Trust Co., Tr. v. Elizabeth Wilson*, 58 R.I. 378, 192 A. 821 (1937); *O'Donnell et al. v. Mathews*, 221 Mo. App. 657, 284 S.W. 204 (1926); *Gates v. Wirth*, 181 Iowa 19, 163 N.W. 215 (1917); *Cummins v. Cummins*, 21 Haw. 742 (1913); *Holmes v. Taber & another*, 9 Allen 246, 91 Mass. 246 (1864).

For example, in *Holmes v. Taber & another, supra*, the Massachusetts Supreme Court held that certain real estate taxes as assessed 22 days before the death of the life tenant were properly chargeable to, and payable by, the estate of the life tenant rather than by the remainderman. In so doing, the court rejected an argument by the executor of the estate that there should be an apportionment between the estate and the remainderman so that the estate would be required to pay only that portion of the real estate taxes covering the period during which the life tenant had the benefit of the estate. The court reasoned that

> [t]he period of time fixed in reference to ownership as to taxation is the 1st of May in each year. The liability of an individual to be taxed for any specific property is decided by the relation he bears to it at that precise day; and whether he may have become the owner on the day previous, or ceased to be such owner the day succeeding, is wholly immaterial.

9 Allen at 247-48, 91 Mass. at 247-48.

Likewise, in *Gates v. Wirth, supra*, the Iowa Supreme Court addressed a dispute between a life tenant and the remainderman regarding the obligation, between themselves, for payment of real estate taxes. In *Gates*, the life tenancy terminated in August and the taxes were due and payable the first of January the following year. The trial court prorated the real estate taxes between the life tenant's estate and the remainderman. On appeal, the court determined that the remainderman, not the life tenant, was responsible for the taxes because the life estate ter-

minated before the current taxes became a lien. The court also determined that the trial court improperly prorated the real estate taxes between the estate and the remainderman. In so holding, the court stated:

> No one is under obligation to pay taxes until after the levy has been made; that is, until the amount chargeable is charged to the specific property. The duty to pay the amount thus fixed does not arise until the 1st of January following.
>
> The duty to pay, in order to discharge the land, as between title owners, rests, generally speaking, on the owner of the land at the time the annual tax to be levied is actually ascertained, fixed, and levied . . . .
>
> It follows, therefore, that, inasmuch as the estate of the life tenant in this case expired before any levy of taxes had been made for that year, before the burden of taxes for that year was imposed upon the real estate in question, he was under no obligation to discharge the taxes for that year for the benefit of the remainderman. The tax in question did not come into existence as an enforcible claim against the land until the remainderman came into possession of the land, freed from the burden of the life estate.

181 Iowa 26-27, 163 N.W. at 218. Since property tax liability is not determined until December 31 following the prior year, real property tax liability should not be apportioned between the estate of the life tenant and the remaindermen.

If this court accepts as true all the well-pled facts and the proper and reasonable inferences of law and fact which may be drawn therefrom, we must assume that William and America are the remaindermen and that Olsen was the life tenant of Leafdale Place. In so doing, however, we know that real property tax liability is not determined until December 31 following the prior year and that apportionment of real property tax liability is disallowed.

William and America were, in fact, responsible for the 1995 real property taxes on Leafdale Place. As a consequence, Cherie's demurrer should have been sustained. We reverse, and remand with directions to dismiss the petition.

REVERSED AND REMANDED WITH DIRECTIONS TO DISMISS.