**Adelia BUSCHMEYER, Pearl Tilly and Anna Tilly, Respondents,**

**v.**

**Ben EIKERMANN, Emilie Eikermann, Esther Eikermann, Howard Eikermann and Geneva Kochur, Appellants.**

**No. 50070.**

Supreme Court of Missouri,

Division No. 1.

May 11, 1964.

Raymond C. Lewis, Jr., Smith & Lewis, Columbia, Randolph E. Puchta, Hermann, for appellants Ben Eikermann and Emilie Eikermann.

Bond & Dominique, John O. Bond, P. Pierre Dominique, Jefferson City, for respondents.

COIL, Commissioner.

■ Respondents brought an action to determine title to real estate (involving the construction of a will), for partition and for an accounting for rents and profits which allegedly had accrued to those in possession. Certain of the defendants answered and alternatively counterclaimed for recovery for permanent improvements made and taxes paid under a belief of ownership of the fee simple title. We have jurisdiction because title to real estate is involved. Article V, Section 3, Missouri Constitution, V.A.M.S.

The first issue is the construction of the will of Frederick Eikermann:

"1. I direct the payment of all my just debts and funeral expenses.

"2. I give and bequeath to each of my children the sum of One Dollar ($1.00), namely; Ben Eikermann, Frank Eikermann, Perle Tilly, nee Eikermann, Anna Tilly, nee Eikermann, Adelia Eikermann, Charles Eikermann and Fred Eikermann, Jr.

"3. All of the residue of my property of whatever kind it may consist, I give, devise and bequeath unto my beloved wife, Minnie Eikermann, the same shall be her property as long as she remain a single person and shall also have the income of the same and use such income as she may see fit. In the event that my wife should remarry, then it is my will to give, devise and bequeath unto my said wife that part of this residue as is provided by law and the remainder to be divided equally share and share alike among my seven children hereinbefore named."

The final paragraph (4) provided for the appointment of an executor. Testator died January 18, 1937.

The question is whether by paragraph 3 testator devised a determinable life estate in or a determinable fee simple title to the Eikermann farm of 257 acres located in Gasconade County.

Minnie Eikermann, the widow, deeded the farm to her son Ben, a defendant-appellant, on November 10, 1956, reserving to herself a life estate therein. She did not remarry and died November 23, 1961. Thus it is that Ben Eikermann and the other appellants contend that by the terms of the will Minnie Eikermann received a determinable fee simple and plaintiffs, the daughters of testator, contend that Minnie received a determinable life estate. The question, as are most questions concerning the construction of wills, is troublesome. It is our view, however, that the most recently adjudicated cases in this state construing the phrase or phrases essentially like the phrase "as long as she remains a single person" require the conclusion that, as the trial court held, Minnie Eikermann received a determinable life estate by the third paragraph of her husband's will.

■■ It is agreed that the will is for construction as a matter of law; there was no evidence as to the testator's intention except as it may be determined from the language he used in his will. Oft stated, and obviously, any will is properly construed if the intention of the testator is found and determined. McMillan v. Barnard Free Skin & Cancer Hospital, 304 Mo. 635, 264 S.W. 410, 413 [1]; Housman v. Lewellen, 362 Mo. 759, 244 S.W.2d 21, 23 [2]. That intention is to be determined "from the four corners of the instrument." Boxley v. Easter, Mo., 319 S.W.2d 628, 632 [4].

■ Appellants invite our attention to the fact that Sections 442.460 and 474.480 (all section citations herein refer to sections of RSMo 1959 and V.A.M.S.) provide respectively that it is unnecessary to create or convey an estate in fee simple that the terms " 'heirs,' or other words of inheritance" or "heirs and assigns" be used, provided there is nothing in the will showing expressly an intent to pass an estate less than a fee; for example, an expression which shows that testator intended to convey only a life estate. Appellants remind us further that there is a presumption against partial intestacy, Shaw v. Wertz, Mo., 369 S.W.2d 215, 218, 219, and that testator in the present will did not provide for a distribution or gift over in the event Minnie died without having remarried.

It is fair to say that appellants essentially rely upon two Missouri cases to sustain their contention that the testator intended to devise a determinable fee simple estate, Wise v. Crandall, Mo., 215 S.W. 245, and Gaven v. Allen, 100 Mo. 293, 13 S.W. 501.

The court in the Wise case needed to construe the following clause contained in the will which was described as "an instrument remarkable for its obscurity."

"First. I will that all my debts be paid after all my just debts are paid I hereby will and bequeath all my property both real and personal to my wife Lydia Crandall to have and to hold as her own during her natural life, and in the event of the death of my wife Lydia Crandall I will that all my property both real and personal shall go to my daughter Ernistine Crandall to have and to hold as long as she may remain single and unmarried, but in case she should marry before the death of myself or the death of the said Lydia Crandall then she may have two hundred dollars more than any of my bodily heirs who shall share as follows: I will that my son Caleb G. Crandall, Josephine Crandall, now Josephine Wise, Ristoria G. Crandall and the bodily heirs of Mary A. Wise shall share equally in my estate both real and personal after that Charlena G. Crandall shall have received fifty dollars, but if the said Ernistine Crandall should remain single and unmarried then she may hold all my estate as her own, otherwise she may receive two hundred dollars more than any other heir who is mentioned in this will." 215 S.W. 246.

In construing the foregoing clause, the court said: "It will be seen that no condition is attached to the fee devised to Ernistine upon the death of her mother unless it be included in the words 'to have and to hold as long as she may remain single and unmarried.' * * * The words quoted alone express with technical certainty the intent to devise and bequeath all testator's estate, both real and personal, *upon condition* that she should remain unmarried, until by her death the fee should pass to her heirs. With hesitation we have, for the purpose of giving some meaning to words which, in their literal sense, apply only to vested estates, adopted them as expressive of the true intention of the testator. If she should marry before the death of her father and mother the estate would vest in the heirs named in the will as devisees in the proportions therein stated. If the condition subsequent contained in the words we have quoted is lawful and therefore valid, and she should marry after the death of her father and mother, the estate would revert to the heirs of the testator in the proportion fixed by the statute of descents and distributions." 215 S.W. 247.

We call attention to the fact that although the will's language in the Wise case contained the phrase, just as does the will in the present case, "as long as she may remain single and unmarried," the provision in the Wise case, unlike the will in the present case, ended with these words: "but if the said Ernistine Crandall should remain single and unmarried then *she may hold all my estate as her own,* otherwise she may receive two hundred dollars more than any other heir who is mentioned in this will." (Our italics.) 215 S.W. 246.

In Gaven v. Allen, supra, the testator devised to his widow two houses, a farm, his interest in certain other land, and certain personal property. His will then provided: "And my will is, and I desire, that if my said wife, Ellen Gaven, should happen to get married at any time after my death, the above-mentioned property, or any money or property hereafter mentioned, shall be di-vided, share and share alike, between all or any of my children then living; and, as to the rest, residue, or remainder of my property, whatsoever or wheresoever the same may be, and not hereinbefore given and disposed of, after payment of my just debts, funeral expenses, and the expense of providing this, my will, I give and bequeath unto my said wife, Ellen Gaven." 13 S.W. 502.

The court, in construing the above-quoted language, said: "The intention of the testator is too plain to admit of any question. The plaintiff acquired the property now in question under and by virtue of the residuary clause, and she holds it subject to the qualification that she remains unmarried. She has a fee which may continue forever. Still, it will cease, and the property pass to the children, upon her marriage. In short, she has a base or qualified fee, and no more." 13 S.W. 502.

The will in the Gaven case did not contain the clause "so long as she remains single," but, after devising to his wife all his estate, right and title, testator said if his wife "should happen to get married at any time after my death."

Nevertheless, despite the noted differences, we agree with appellants that the two cases above cited give support to their view that the will in the present case devised a determinable fee simple rather than a determinable life estate.

Respondents rely upon two later cases, Tillerson v. Taylor, 282 Mo. 204, 220 S.W. 950, and Winget v. Gay, 325 Mo. 368, 28 S.W.2d 999. In the Tillerson case, the pertinent portions of the will were:

"I order and direct as soon after my decease as practicable to pay off and discharge all the debts, dues and liabilities that may exist against me at the time of my decease. I give and bequeath unto my esteemed wife, Edna Montgomery, all my property, both real and personal, that remains after my debts are paid, to have and to hold the same and enjoy during her

widowhood or so long as she remains my widow.

"If she remarries or in the event of her remarrying again, I desire that all the property should be divided equally between my brothers and sisters and my wife and her brothers and sisters all sharing alike and equal with my wife. * * *" 220 S.W. 950.

In discussing the meaning of the above-quoted language, the court said: "It is doubtless true, since the enactment of that statute, that the words, 'heirs and assigns,' or other words of limitation, are not required in a devise of land to carry the fee to the devisee. Roth v. Rauschenbusch, 173 Mo. 582, 73 S.W. 664, 61 L.R.A. 455. Yet the statute imports that a devise which otherwise would pass the fee will have the effect of passing only an estate for life if expressions are contained in the will which show the testator intended to give no greater estate than one for life, or if there is a devise over of the property after the death of the first taker. Armor v. Frey, 226 Mo. 646, 669, 670, 126 S.W. [483] 495. In the will of Joseph Montgomery expressions were used which show the intention of the testator was to vest the title to the lands in his widow only during her widowhood. The expressions 'to have and to hold the same and enjoy during her widowhood' and 'so long as she remains my widow' occur in the clause wherein the gift to her is made as a definition of the quantity of the estate given. Such a devise always has been held to pass only an estate for life and apter words for that purpose could not be chosen. 2 Black, Commen. 121; Williams, Real Property (17th Internat. Ed.) p. 142; 2 Minor's Institutes, c. 8, par. 2g. Moreover, the estate given was intended to last only 'so long as she remains my widow'; only so long as Edna Montgomery remained the widow of the testator. That expression, and also the one 'during her widowhood,' were apt words to make the life estate one of limitation, which would terminate instantly upon the remarriage of the widow, without entry or other assertion of title by

the remaindermen. 1 Washburn, Real Property (6th Ed.) § 165, p. 79." 220 S.W. 951.

The clause in the Tillerson case, "to hold the same and enjoy during her widowhood," seems to us to clearly indicate an intention to devise only a life estate. We note, however, that the court thought "so long as she remains my widow" were also apt words to pass only a life estate. The court stressed the fact that the expressions, "during her widowhood" and "so long as she remains my widow," occurred "in the clause wherein the gift to her is made as a definition of the *quantity of the estate given*." (Italics present writer's.) 220 S.W. 951.

In Winget v. Gay, supra, the will, after making specific bequests of one dollar to each of testator's brothers and sisters, contained this language: "I give and devise all the residue of my estate to Sarah R. Arthur, as long as she remains single, and if she marry it is my will that she share equally with the other heirs." 28 S.W.2d 999.

The above-quoted clause is essentially like the clause in the present will. Eliminating from consideration the additional words in the present will, that the widow "shall also have the income of the same and use such income as she may see fit," the clause in the present will is in effect, I give, devise, and bequeath unto my beloved wife all the residue of my property, the same shall be her property as long as she remains a single person, and in the event she should remarry, she shall receive a child's share of this residue.

The court in discussing the meaning of the language of the will in the Winget case said:

"'As long as she remains single' are words of limitation and not of condition; they mark the period which is to determine the estate. An estate so limited may last for life and is therefore a life estate, although it terminates upon the marriage of the donee. * * *

"If an estate be given to a woman 'dum sola fuerit,' or 'durante viduitate,' the

grantees have an estate for life determinable upon the happening of these events. This is ancient law. And the cases make no distinction as to the duration of the estate whether the devisee be a widow or an unmarried woman. In both instances the object of the devise is the support of the devisees until marriage and the estates devised are at most life estates.

"The provision under consideration passed to Sarah R. Arthur a life estate with a limitation over, 'if she marry.' The persons who were to take upon her marriage were the testator's heirs. She did not marry, but notwithstanding, the remaindermen, who were also the testator's heirs, took under the will and not as heirs. The rule is well established that, where a testator gives to a woman a life interest if she so long remains unmarried, and then directs that, in the event of her marriage, the property shall go over to another, although, according to the strict language, the gift over is expressed only to take effect in the event of the marriage of the life tenant, the gift over is held to take effect, even though the tenant for life does not marry. For a review of the authorities, both English and American, see Maddox v. Yoe, supra. [121 Md. 288, 88 A. 225]." (Bracketed insert ours.) 28 S.W.2d 1000.

In the more recent case of Riesmeyer v. St. Louis Union Trust Co., Mo., 180 S.W.2d 60, this court construed a paragraph of a will which bequeathed stock in trust for testator's wife "so long as she should remain single." The parties to that litigation agreed that the bequest created a life estate so that the question whether it did was not adjudicated as a controverted issue. This court did say, however, that a construction that the language created a life estate "has the support of judicial authority. Winget v. Gay, 325 Mo. 368, 28 S.W.2d 999, Tillerson v. Taylor, 282 Mo. 204, 220 S.W. 950." 180 S.W.2d 62.

Appellants rely heavily upon the fact that in the present will there was no provision for what distribution should be made or,

as appellants express it, "no gift over" in the event of the death of the widow without having remarried. Appellants say such is indicative of the fact that the estate devised was intended to terminate only upon remarriage and not upon the death of the widow unmarried. Thus, say appellants, it is clear enough that Minnie Eikermann took a determinable fee. Were we determining as a matter of law the present testator's intention from the language he used, without reference to the prior decisions in Tillerson and Winget, supra, we should attach much importance to the fact that testator made a gift over only in the event of his widow's remarriage and not in the event of her death unmarried, as indicating that testator intended to convey a determinable fee. Indeed, myriad cases from other jurisdictions have so viewed such provisions. The fact is, however, that the Winget case seems to settle the present question so far as Missouri is concerned. That case held that the words "as long as she remains single" constitute words of limitation and not of condition; and in neither the Winget nor the Tillerson case was there a gift over in the event of the death of the widow unmarried.

Appellants further suggest the presumption against partial intestacy as another compelling reason for finding that it was testator's intention to devise a determinable fee. But the Winget case holds that the gift over in the event of remarriage takes effect in the event the life tenant dies without having remarried and, if so, there is no partial intestacy.

Appellants also contend that inasmuch as testator devised to his wife a fee simple estate in a portion of the residue of his property in the event of her remarriage, it should not be said that he intended the estate he conveyed in the event she did not remarry was an estate less than a fee. While the widow may have received a "lesser estate," when the will is construed to have devised a determinable life estate, than she would have received in the event of her remarriage in the sense that a life

estate is "less than a fee," it is also true, as respondents point out, that a life estate with full enjoyment and use of the income from a farm of 257 acres is probably of more value and, in that sense, "a greater estate" than the widow would have received in the event of her remarriage.

Appellants have cited a number of well reasoned cases from other jurisdictions which have construed language similar to or practically the same as that contained in the present will, as having devised a determinable fee. Illustrative of a long list of such cases are: Taylor v. Farrow, Ky., 239 S.W.2d 73; Dickson v. Alexandria Hospital, Inc. (4 Cir.), 177 F.2d 876; Pumroy v. Jenkins, 151 Kan. 466, 99 P.2d 752; In re Estate of Mattison, 122 Vt. 486, 177 A.2d 230. And see Washington U.L.Q., 1951, p. 595, comment: "'To My Wife So Long As She May Remain My Widow' —Determinable Fee or Life Estate?"

While we recognize that because of the almost infinite variety of expressions employed in different wills, we should not be bound by a prior case construing a will containing language different in any essential respect from that contained in the will being presently considered, we are convinced that Winget v. Gay, supra, is controlling here. That is because the language there is essentially the same as that contained in this will, and because the opinion in that case, written in 1930, stated the rule applicable to the language used in present testator's will written in 1936, and probated in 1937.

As noted, appellant Ben Eikermann alternatively claimed and sought by counterclaim to recover for taxes paid and permanent improvements made on the Eikermann farm in the event it was determined that he did not own the fee simple title thereto. Ben's mother and father (testator) lived in the home place until the father's death in 1937 and thereafter his mother continued to live there until her death on November 23, 1961, except for the times when, due to her health, she was kept at Ben's home. Ben's brother Charles lived with his mother at the home place until Charles died in 1955. After their father's death the two sons, Ben and Charles, each rented a part (probably one half each) of the land devised in Frederick's will, under a rental agreement with their mother whereby each furnished all his seed, machinery, and labor, and each paid the mother one third of the crops realized. After Charles's death in 1955, Ben and his son Howard rented the entire farm under the same arrangement. The mother deeded the farm to Ben on November 10, 1956, reserving to herself a life estate therein.

The reasonable market value of the land at that time was about $19,000. Ben testified at the time the deed was given his agreement with his mother was that she was to retain a life estate, that he was to take care of her for the rest of her life, pay her funeral expenses, "and pay all her expenses." Ben and his son Howard continued to farm under the one-third crop agreement until the time of Ben's mother's death in December 1961. Ben paid the taxes on the farm, beginning in 1956 (the year in which he received the deed) to and including the taxes for the year 1962, amounting to a total of $1,214.82.

Ben adduced evidence that he made permanent improvements on the farm beginning in the year 1956. He established some permanent pasture (of which there was none in 1956) so that by trial time there were 32 or 33 acres of such pasture. He expended between $500 and $600 in making that improvement. His evidence showed further that beginning in 1957 or 1958 he drained and cleared certain of the bottomland, some of which was grown up in brush and trees and much of which did not properly drain. This project included digging a ditch several feet deep, three fourths of a mile long, and digging lateral ditches. Such drainage added 40 or 45 acres which could be cultivated and which previously had been swamp, and provided proper drainage for many more acres. The testimony was that a Mr. Graves who had

been hired to do some of this work was paid $568.36 for the ditching and draining by Ben and that "the government" paid Mr. Graves an additional $429.64. The evidence showed further that Ben had rebuilt all the fences which were on or around the farm and, in addition, had installed some new fences; and in so doing had used about 700 white oak fence posts and about 170 railroad ties and that he had purchased and installed a large quantity of new wire. In addition, he had cut trees and sprouts and removed stumps by the use of dynamite.

Other than the expenditures heretofore noted, there were no figures given as to the cost of these improvements. For example, even though Mr. Eikermann testified that he and his son worked an average of three months every year from 1956 or 1957 until 1961 on the drainage improvement, no estimate of the value of their labor expended thereon was made and no figures were stated as to the value of their labor involved in the establishment of the permanent pasture or in the replacement or building of fences.

Appellants offered to prove that solely by reason of the improvements made the reasonable market value of the farm had increased from $19,000 in 1956 to $27,000 or $28,000 at the time of trial. The court sustained objections to the proffers not only with respect to the total by which the value of the farm had been increased but also with respect to how much each improvement had enhanced the value of the farm. The offers in those respects were that the draining and clearing had enhanced the value by $6,000, the fencing by $2,500, permanent pastures by $1,000, and the clearing of the 6-acre tract was an improvement of the reasonable value of $100.

Plaintiffs contended below and contend here that the taxes paid by Ben Eikermann were not paid by him in good faith in the belief that he was the owner of the fee and that whether they were is of no consequence because the taxes were the obligation of his mother as the life tenant and

thus must have been paid by Ben under the arrangement between him and his mother; that the improvements likewise were not made in good faith and that, in any event, Mr. Eikermann was not entitled to recover in excess of his actual expenditures in making the claimed improvements.

There is no dispute that plaintiffs were entitled to a credit of $354 which was received by Ben as his share of the proceeds on the crops on the farm between the date of his mother's death and the time of trial.

The evidence showed that the plaintiffs were the sisters of defendant Ben Eikermann; that two of the sisters, Anna Tilly and Pearl Tilly, had made no claim of ownership until the institution of this action and that all three plaintiffs had heard reports that Ben Eikermann claimed ownership of the farm. The evidence showed further that plaintiff Adelia Buschmeyer had brought a partition suit in 1955 (as to the land presently involved) which was dismissed without prejudice in September 1956; that Ben Eikermann was a party to that suit, was represented by an attorney, and filed a pleading. There was evidence to the effect that Ben had been advised by his lawyer that plaintiff (Adelia) had an interest in the land and that Ben had, in effect, offered $2,500 for that interest. Defendant Ben Eikermann's evidence showed that after the dismissal of the 1955 partition suit, he obtained a written opinion dated October 1, 1956, from an attorney (the opinion was in evidence) to the effect that Frederick's will devised a fee simple determinable to Minnie Eikermann and that, consequently, she lawfully could convey to him (Ben Eikermann) a fee simple title which could be divested or defeated only by her remarriage. Ben denied that his attorney in the partition suit told him that his mother had only a life estate or that his sisters would share in the land or that Mrs. Buschmeyer wanted $5,000 for her share or that he said he would sell his share for $5,000.

The trial court, after correctly construing the will as devising a determinable life es-

tate to the widow, Minnie Eikermann, ordered the partition of the land devised by the will (it was admitted that the land could not be satisfactorily partitioned in kind) and the parties agree that their respective interests are correctly set forth in the decree.

We first consider the allowance of the $1,214.82 credit for taxes paid. It is the obligation of a life tenant to pay the taxes for the duration of that tenancy in the absence of a clear provision to the contrary in the instrument creating a life estate. Burnett v. Quell, Mo.App., 202 S.W.2d 97, 98 [1] ; Duffley v. McCaskey, 345 Mo. 550, 134 S.W.2d 62, 64 [2], 126 A.L.R. 853. Mrs. Eikermann, Ben's mother, was the life tenant under the provisions of testator's will, but more important on this aspect of the case, she was a life tenant also by reason of the reservation in the deed from her to Ben executed in accordance with an agreement between them. The amounts Ben paid, except $191.15 for 1962 taxes, were for taxes which accrued while his mother was the life tenant. It is undoubtedly true that Ben entered into the agreement with his mother by the terms of which she was to convey title to Ben subject to her life estate, Ben was to care for his mother for the remainder of her life, pay her funeral expenses, and "pay all her expenses," in the honest belief that Mrs. Eikermann had received a determinable fee simple under the will of her husband and, therefore, lawfully could convey a fee simple title to him subject to being defeated only by her remarriage. It is undoubtedly true also that Ben paid the taxes from 1956 through 1961 under the belief and expectation that he would have the fee simple title to the farm upon the death of his mother.

We are of the view, however, that under all the foregoing circumstances shown by the evidence, the most reasonable conclusion is that Ben paid the taxes (1956–1961) because that was his obligation under his agreement with his mother, albeit, under the erroneous belief that she held a determinable fee at the time of her deed to him. It appears, therefore, that Ben's claim, if any, for the amount he paid for taxes, except 1962 taxes, is against his mother's estate. At least, that conclusion seems compelled in the absence of any evidence in the record that the life tenant was unable to have paid the taxes (1956–1961) and would not have paid those taxes in the event she had had no agreement with Ben to do so. It follows that the credit to appellants for the amount paid for taxes should have been in the sum of $191.15.

The trial court disposed of the other issues by holding that Ben Eikermann, in addition to paying taxes in the sum of $1,214.82, had paid $1,068.36 for improvements, had received $354 from crops since his mother's death, and that, consequently, appellants were entitled to a credit of $1,929.18 to be recovered from the proceeds on partition.

It is apparent, of course, that the trial court held, as a basis for its conclusions above stated that Ben Eikermann had made the improvements in good faith in the belief that he was the owner of the fee simple title, and honestly had made such improvements for the purpose of improving the property and not for the purposes of either encumbering the estates of his cotenants or hindering the partition. Our independent review of the record convinces us that the trial court correctly so found.

The parties are in disagreement as to the proper measure of damages for recovery for permanent improvements made by one tenant in common without the consent of the other tenants in common but made in good faith and under the circumstances heretofore noted.

It is appellants' contention that the proper measure is the amount by which the value of the real estate was enhanced solely by reason of the permanent improvements. It is respondents' contention that the proper rule is that the cotenant may recover for the actual cost of any improvement made

if and only to the extent that such improvement enhanced the value of the property.

We are here dealing with improvements made by one cotenant without the consent of the other cotenants but made by the improver in good faith. Appellants sought in a counterclaim to recover for such improvements by the enforcement of an equitable right and, alternatively, to recover for such improvements under the terms of Section 524.160 and C.R. 89.16 (the "betterment" statute or rule). Appellants contend that under either theory of recovery the measure of damages is the same, but while we shall refer to both types of cases, we confine any conclusion herein to the factual situation stated above, i. e., recovery for improvements made by one tenant in common from another tenant in common.

The cases relied upon by appellants support their position. In Burford v. Aldridge, 165 Mo. 419, 63 S.W. 109, 112, the court found that as to a partition of the farm there involved between one Aldridge and the Burford heirs, Aldridge had made permanent valuable improvements before he had notice of plaintiffs' claim and that the part of the farm allotted to him should contain those improvements if such could properly be done, and if a sale of the farm was necessary, the improver "would be entitled, in addition to three-fourths of the net proceeds, to the amount, if any, the court may find that the price realized was enhanced by such improvements so made; but unless the court finds that the price was so enhanced, and the amount thereof, such improvements will not be considered."

Armor v. Frey, 253 Mo. 447, 161 S.W. 829, 838, held that the rule as to the measure of damages in partition among cotenants for improvements made by one "honestly for the purpose of improving the property, and not for the purpose of embarrassing his cotenants, or incumbering their estate, or hindering partition" was as follows: "* * * an allowance for whatever amount it may be found that the value of land has been increased by the improvements placed there * * *."

Sires v. Clark, 132 Mo.App. 537, 112 S.W. 526, a case often cited to support the rule appellants say is the correct one, was not one in which one cotenant sought a credit from his cotenants on partition but rather a suit to recover the value of improvements made by one who thought himself to be the owner but who had been ousted from the real estate. The court said, "The ordinary advance in the value of the land is no part of the measure; nor is the cost of the improvements the measure, as they may have cost too much, or may not have been judicious. The measure is the addition in value the improvements have made to the land over and above what the value would have been had they not been made." 112 S.W. 527. The instruction, however, upon which plaintiff conditioned his right to recover and which was approved by the court, hypothesized that if the jury believed he had made the improvements in good faith, etc., he should recover "the difference in the value of eight-tenths of said lands with said improvements and without said improvements, not however to exceed the reasonable value of the cost of said improvements * * *." 112 S.W. 527.

Rains v. Moulder, 338 Mo. 275, 90 S.W. 2d 81, was a suit in which one had occupied property, had made improvements in good faith and sought to recover for such improvements, and the court, at page 86, stated on the authority of Sires v. Clark, supra, that "the measure of compensation allowable for improvements made in good faith by an occupying claimant upon land—that is, the amount by which the value of the land is enhanced by the improvements."

In Anderson v. Sutton, 308 Mo. 406, 275 S.W. 32, a case wherein Anderson was ejected from real estate and sought to recover for improvements which he had placed thereon, the court, at 275 S.W. 35, 36, held that an instruction was properly refused which, in effect, told the jury that the improver could not recover for improve-

ments more than it had cost to make them because it would be "just to make the landowner pay what the improvements were reasonably worth at the time he takes them over * * * the value of the improvements ought to be assessed at what they are reasonably worth to the land at the time the landowner takes them over."

Krahenbuhl v. Clay, 346 Mo. 111, 139 S.W.2d 970, 129 A.L.R. 1344, did not involve the question of recovery for improvements among tenants in common but rather the recovery of compensation for improvements made by a purchaser of land at a tax sale which was subsequently set aside. The court, at page 978 of 139 S.W.2d, said that the "true measure of defendants' recovery is not the cost of making the improvements or their particular value to defendants, but the value of the improvements as measured by the enhancement in the value of the land to the true owner thereof."

Respondents in support of their contention cite and rely upon Goforth v. Ellis, Mo., 300 S.W.2d 379, and Beckham v. Eggleston, Mo.App., 341 S.W.2d 337. In the Goforth case this court said: "The right to compensation for improvements, made without the consent of cotenants, is not a legal right but may be enforced in equity for payment out of proceeds of partition, when they are made in good faith and are of a necessary and substantial nature, materially enhancing the value of the common property, where the circumstances show that it would be equitable to do so. 14 Am.Jur. 115–119, Sec. 49; 40 Am.Jur. 32–38, Secs. 39–45; 68 C.J.S., Partition, § 139, p. 221; 86 C.J.S., Tenancy in Common, § 68, p. 450; Annotations 1 A.L.R. 1189, 122 A.L.R. 234. The evidence indicates these charges were reasonable and we hold the circumstances of this case are such as to make it equitable to require plaintiff to pay half of the cost of these improvements. See also O'Donnell v. Mathews, 221 Mo.App. 657, 284 S.W. 204; Armor v. Frey, 253 Mo. 447, 161 S.W. 829; Lester v. Tyler, Mo.Sup., 69 S.W.2d 633, 638; Adams v. Adams, 348 Mo. 1041, 156 S.W.2d 610, 617; Henry v.

Steward, 363 Mo. 213, 250 S.W.2d 527, 529." 300 S.W.2d 384.

And in the Beckham case the court said: "The rule is that the right to compensation for improvements, made without the consent of cotenants, is not a legal right, but may be enforced in equity for payment out of proceeds of partition, when they are made in good faith and are of a necessary and substantial nature, materially enhancing the value of the common property, when the circumstances show that it would be equitable to do so." 341 S.W.2d 341 [6–7]. The court there allowed the cotenant to recover the total expenditures made on the common property holding that the circumstances showed that the allowance of such expenditures would be equitable.

Thus, both the Goforth and Beckham cases, supra, made it clear that the right of a cotenant to recover for improvements made under circumstances like the present is an equitable right and there is language in both those cases indicating that the amount of the recovery should depend upon the facts and circumstances in each case and whether, under all the circumstances, it would be equitable to require one cotenant to pay an amount to another for improvements the other made. In both those cases the court allowed (in Goforth) only one half the cost of the improvements and (in Beckham) the court allowed recovery of the total expenditures made for improvements. In both cases, however, the court cited cases and texts, some of which state the rule contended for by appellants. For example, in Goforth v. Ellis, supra, Armor v. Frey is cited in support of the proposition that it would be equitable to require the plaintiff to pay half the cost of the improvements. As we have heretofore noted, Armor v. Frey stated the rule contended for by appellants.

Furthermore, in the Beckham case, supra, 341 S.W.2d 339, the appellants' contention, here pertinent, was that the trial court erred in charging against the proceeds of the partition the sum of $5,804.14 "for im-

provement expenses"; and in the Goforth case, supra, the question was whether the court had correctly allowed the amount of certain expenditures for improvements made by one of the parties. The point is, apparently in neither case (Goforth or Beckham) relied on by respondents was there a contention, as here, that the proper measure of damages for recovery for permanent improvements is the amount by which the value of the real estate was increased solely by reason of the permanent improvements made.

Both parties rely on various statements made in American Jurisprudence and Corpus Juris Secundum, and statements therein do support both contentions. See 27 Am.Jur., Improvements, § 22, pp. 276–278; 40 Am.Jur., Partition, § 39, pp. 32, 33, § 45, pp. 37, 38, § 48, pp. 40, 41; 68 C.J.S. Partition § 139a, pp. 221–223, § 139c(3), pp. 226, 227.

In 68 C.J.S. Partition § 139a, supra, it is stated:

"As a general rule, where a cotenant places improvements on the common property, equity will take this fact into consideration on partition and will in some way compensate him for such improvements, provided they are made in good faith and are of a necessary and substantial nature, materially enhancing the value of the common property."

■■ It seems to us that the question is always (where cotenants are concerned) what is just and equitable under the particular circumstances of a certain case? Sometimes it would appear equitable that a cotenant be limited to recovery of the cost of the improvements, limited always to a maximum recovery of the amount by which the value of the property was enhanced solely by reason of the improvements made. Under the circumstances of the present case, however, it appears to us that it would be equitable to permit the cotenant to receive credit for the amount by which the value of the land was in-

creased solely by reason of the improvements he made. Appellants suggest that this court may fix that amount and enter a judgment therefor. We are not in a position to so do, however, because appellants made only offers of proof (not in the form of the presentation of actual testimony by proffered witnesses), and objections were sustained to the offers made. And furthermore, respondents in the event their objections to the offers of proof had been overruled, probably would have offered evidence as to the amount, if any, the value of the farm had been increased solely by reason of the improvements made. Thus, the case must be remanded for the purpose of hearing such evidence on that issue as the parties may choose to present.

As noted, count 2 of plaintiffs' petition sought partition of the farm devised by testator, Frederick Eikermann, located in Gasconade County. Count 3 sought partition among plaintiffs and one of the defendants of land located in Osage County as to which plaintiffs claimed as tenants in common as a result of a deed and a will other than and unconnected with the will and deed under which plaintiffs claimed to be tenants in common in count 2. The trial court dismissed count 3 and plaintiffs have appealed from that part of the court's judgment.

■ Plaintiffs contend the trial court erred in dismissing count 3 because, they say, under the provisions of Section 528.040 and Civil Rule 96.04 the Circuit Court of Gasconade County had jurisdiction to partition the land located in Osage County. Civil Rule 96.04 provides in pertinent part: "*Such petition* shall be filed in the circuit court of the county in which such lands, tenements or hereditaments lie; but *if the same shall lie in two or more counties,* whether in detached parcels or otherwise, *said petition* shall be filed in the circuit court of the county in which any portion of *such premises* are situated, and a majority of the parties entitled thereto reside; * *.*" (Our italics.) We do not find that this con-

tention has been ruled heretofore, but we are of the view that the trial court correctly dismissed count 3.

The words *"such petition"* and *"said petition"* in Civil Rule 96.04 refer to the partition suits provided for in Civil Rules 96.01 and 96.02. An examination and consideration of those rules convince us that the provisions of Civil Rule 96.04 permitting a partition suit to be brought in any county "in which any portion of such premises are situated, and a majority of the parties entitled thereto reside," do not authorize the joinder of *separate and distinct partition actions* in one petition where, as here (and we limit our construction of the rule to the present fact situation), all the land involved in one action is located in one county and all the land involved in the separate action is located in a different county, and where, as here, the parties affected by the two partitions do not claim under the same document or documents in both actions, and where, as here, all the parties to the two actions are not the same. Thus, in this case, where plaintiffs in their first action set forth in counts 1 and 2 claimed to be tenants in common with several of the defendants as to land located in Gasconade County by reason of the provisions of the will of Frederick Eikermann and sought partition of that land, they may not properly join a separate action (although set forth as a count of the same petition), seeking partition of land located in Osage County as to which plaintiffs claimed to be tenants in common (with only one of the defendants) under a will and deed different from the documents under which they claimed as tenants in common as to the Gasconade County land.

Esther Eikermann, a defendant below, who did not appeal, filed a motion to dismiss the appeal as to her which was taken with the case. We have examined and considered the motion and the suggestions in opposition, and without extending further this too-long opinion, we are of the opinion that the motion to dismiss should be and therefore it is overruled.

The judgment, in so far as it construes Frederick Eikermann's will, adjudges the interests of the parties in the Gasconade County land, orders partition thereof by public sale, orders the dismissal of count 3 of plaintiffs' petition, and adjudges that defendants take nothing under counts 1 and 2 of their counterclaim, is affirmed. The judgment, in so far as it allows Ben Eikermann a credit in the net sum of $1,929.18 to be paid from the proceeds of the partition sale, is reversed and the case is remanded for further proceedings relating to the issue as to the amount of the credit which should be allowed Ben Eikermann to be paid from the proceeds of the partition sale, in accordance with the views herein expressed.

HOUSER and WELBORN, CC., concur.

PER CURIAM:

The foregoing opinion by COIL, C., is adopted as the opinion of the court.

All concur.